In re CRESCENT BEACH INN,
INC., Debtor.

**Bankruptcy No. 182–00194.
(Formerly 282–00112).**

United States Bankruptcy Court,
D. Maine.

July 12, 1982.

Bruce A. Coggeshall, George J. Marcus, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for plaintiff.

Peter S. Plumb, Clarke C. Hambley, Murray, Plumb & Murray, Portland, Me., for debtor/defendant.

## MEMORANDUM OF DECISION

JAMES A. GOODMAN, Bankruptcy Judge.

The debtor, Crescent Beach Inn, Inc., is a corporation in the hotel and restaurant business. It owns an ocean-front Inn containing fifteen overnight rooms, a main dining area, function room and two bars, plus several cabins rented on a yearly basis.

Pursuant to authorization granted by the Board of Directors, the debtor filed a Chapter 11 petition in bankruptcy on March 15, 1982.[1] On March 24, 1982, Richard Davis moved in the alternative for dismissal of the petition, appointment of a trustee, or reduction of the time within which the debtor has the exclusive right to file a plan of reorganization. Motions by the United States Trustee and the Creditors' Committee to appoint a trustee, and by the latter for reduction of time to file a plan, were consolidated with Richard Davis's motion. Three days of hearings were held, after which the parties filed briefs.

The Court finds the following facts. In 1980, Donald Davis purchased all of the stock of the debtor, mainly with $40,000 that Barbara Davis, Donald's grandmother and Richard Davis's mother, had borrowed and turned over to Donald for that purpose. In return, the debtor issued Barbara a promissory note secured by a mortgage on debtor's real property for the sum of $40,-000. On the date of filing, Barbara was owed over $30,000 on that note.

On April 30, 1980, Donald and Barbara were elected as directors; Donald was elected President and Treasurer; Richard Davis, an attorney and Donald's uncle, was elected Clerk. Donald has acted as manager of the Inn since the purchase.

The debtor's 1980 federal tax return reflects gross sales of $418,246[2] and a net loss of $46,324. Figures for 1981 were in dispute: an accountant estimated gross sales at $348,000, while Donald testified that the 1981 daily sales reports totalled $405,000. The debtor lost in 1981 between $35,000 and $90,000. Substantial capital improvements were made at the Inn during 1981. Donald estimated that over $10,000 income was lost from cabin rentals that year because cabins

---

1. The debtor's board consists of two directors, Donald Davis and Barbara Davis.

2. Gross sales for 1979 totalled $533,177.

were closed for renovations.[3] Leo Amato, a bank loan officer, testified that present management of the Inn had cut food costs and increased the gross profit margin as compared to the previous owners, but that sales still needed to be increased. Suzanne Friel, an accountant, testified that while the debtor's bookkeeping "could have been more organized," it had improved compared to the records kept by the previous owners. Friel further testified that the debtor used the one-write checking system which, if used properly, would be adequate to keep track of the debtor's cash flow. She stated, however, that to operate properly, there would have to be a separate system for each checking account—the debtor had several checking accounts, but only one one-write system.

The debtor's checking accounts at two banks were frequently overdrawn in 1981 and 1982. The largest overdraft appears to have been about $2,000, and all the evidence indicates that all overdrafts were made good, often by Richard Davis.

On the date of filing, March 15, 1982, the debtor had no insurance coverage in effect. Local Bankruptcy Rule 2007(b)(2) requires the debtor to maintain insurance coverage at a level at least equal to the level in force one-year prior to the commencement of the case. The debtor substantially complied with the rule on April 1, 1982, and appears to have fully complied when it acquired liquor liability insurance on May 20, 1982.

Since April, 1981, Donald Davis and family have lived without paying for room or board at Crescent Beach Inn. Donald Davis also received free gasoline from the debtor. Donald's salary had been set at $300 per week, but in November and December of 1981, Donald actually received only two salary checks. The debtor's application to continue employing Donald revealed the free rent, but not the debtor's supplying of meals or gasoline.

In the fall of 1981, Donald Davis personally borrowed $1,800 from Harry Baker in order to pay sales taxes owed by the debtor to the state. Proceeds from a video game located on the debtor's premises were used to pay back the loan. The debtor's books reflect those proceeds as miscellaneous income collected by the Inn, and then as additional salary paid out to Donald.

Donald Davis has worked full-time as manager of the debtor since 1980. Resolving conflicting testimony, the court finds that Donald has taken little time off from his job, and has conducted himself conscientiously and soberly at the Inn.

Richard Davis has injected substantial amounts of capital into the debtor. He is the holder of several mortgages, and alleges that, at the time of filing, he was the sole stockholder.[4] Initially he and Donald were on good terms, but as the debtor continued to lose money, their relationship soured. Richard testified to many occasions when Donald made allegedly false statements to him. While most of these statements concerned matters not of great consequence, it seems clear that they contributed to the breakdown of good relations between Richard and Donald. At an angry meeting in November, 1981, Richard and Donald aired their mutual displeasure with the then-existing state of affairs. In early 1982, Richard commenced foreclosure proceedings in state court on his mortgages. In response, the debtor filed its Chapter 11 petition.

## I. Dismissal of Petition

Richard Davis contends that the filing of the debtor's Chapter 11 petition was not properly authorized, and, therefore, it should be dismissed.

■ The authority to file a bankruptcy petition depends upon the governing instruments of the corporation and on state law. *See In re Al-Wyn Food Distributors, Inc.*, 8 B.R. 42, 43, 7 B.C.D. 126 (Bkrtcy.M.D.Fla. 1980). The parties concede that on the date of filing, Barbara Davis and Donald Davis

---

**3.** Richard Davis disputed the amount of actual losses of income due to renovations.

**4.** In light of the court's disposition of this case, the court need not determine who the debtor's stockholders were at the time of filing.

were the only directors of the debtor. On that date, they voted to file the Chapter 11 petition. Maine law provides that the business and affairs of a corporation shall be managed by a board of directors, absent corporate provisions to the contrary. *See* Me.Rev.Stat.Ann. tit. 13–A, § 701; Bylaws of Crescent Beach Inn, Inc., Art. IV, §§ 1, 4. While the power to dissolve a corporation is reserved to the shareholders, *see* Me.Rev.Stat.Ann. tit. 13–A, §§ 1102, 1103, it has been held that "the right of directors to authorize bankruptcy is not inconsistent with the right of the stockholders to authorize dissolution." *In re Joseph Feld & Co.*, 38 F.Supp. 506, 507 (D.N.J.1941); *see also Boyce v. Chemical Plastics, Inc.*, 175 F.2d 839 (8th Cir.) *cert. denied* 338 U.S. 828, 70 S.Ct. 77, 94 L.Ed. 503 (1949); *cf. Royal Indemnity Co. v. American Bond & Mortgage Co.*, 289 U.S. 165, 170–71, 53 S.Ct. 551, 554, 77 L.Ed. 1100 (1933) (Maine statute prohibiting transfer of franchises or assets of corporation without consent of stockholders does not preclude filing of voluntary petition by authority of directors without vote of stockholders); *In re Pneumatic Tube Steam Splicer Co.*, 60 F.2d 524, 525–26 (D.Md.) (directors can act without vote of stockholders even though one director owns virtually all the stock).

■ Richard Davis contends that Barbara Davis had a "personal or adverse interest" under Maine law. Me.Rev.Stat.Ann. tit. 13–A, § 717 provides in part:

1. No transaction in which a director or officer has a personal or adverse interest, as defined in subsection 2, shall be void or voidable solely for this reason or solely because he is present at or participates in the meeting of the board, or of a committee thereof, which approves such transaction, or because his vote is counted, if

A. The material facts as to his interest and as to the transaction are disclosed or are known to the board of directors or committee, and are noted in the minutes, and the board or committee authorizes, approves or ratifies the transaction by a vote sufficient for

such purpose without counting the vote of the interested director or directors; or if

B. Although the vote of the interested director or directors is decisive of approval or disapproval of the transaction, the material facts as to his interest and as to the transaction are disclosed or known to the shareholders, and the transaction is specifically approved by vote of the shareholders, whether or not the votes of interested shareholders are necessary for such approval; or if

C. Although the requirements of paragraphs A and B have not been satisfied, the transaction is fair and equitable as to the corporation at the time it is authorized or approved, and the party asserting the fairness of the transaction establishes fairness.

2. A transaction in which a director or officer has a personal or adverse interest shall include

A. A contract or any other transaction between the corporation and one or more of its directors or officers;

B. A contract or any other transaction between a corporation and any corporation, partnership or association in which one or more of its directors or officers are directors or officers or partners, or have a financial interest, direct or indirect; but the ownership of not over 10% of any class of stock issued by a corporation whose shares are traded on any national securities exchange or are regularly quoted by any member of a national or regional association of securities dealers shall not be considered "a financial interest".

Barbara Davis holds a mortgage on certain property of the debtor. Assuming, without deciding, that by reason of the effect bankruptcy would have upon her mortgage Barbara Davis had a "personal or adverse interest" in the vote authorizing the debtor to file in bankruptcy, the court finds that said vote was "fair and equitable as to the corporation at the time it [was] authorized or approved...." *Id.* § 717(1)(C). At the

time of the vote foreclosure proceedings by Richard Davis were in progress. If successful, foreclosure would likely have resulted in the debtor's liquidation. Thus, it seems clear that authorization to then file in Chapter 11 in order to attempt an effective reorganization of the debtor was fair and equitable *as to the corporation.*[5] The motion to dismiss the petition is denied.

### II. Appointment of a Trustee

■ Title 11 U.S.C. § 151104(a) provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

A party requesting such relief has the burden of proof. *See Sea Queen Kontaratos Lines, Ltd.,* 10 B.R. 609, 609–10, 7 B.C.D. 601, 602, 4 C.B.C.2d 491, 493 (Bkrtcy.D.Me. 1981). Evidence that current management *grossly* mismanaged the debtor's affairs prior to filing is cause for appointment of a trustee. However, "some degree of mismanagement exists in virtually every insol-

vency case. The philosophy of Chapter 11 is to give the debtor a 'second chance'...." 5 *Collier on Bankruptcy* ¶ 1104.01 at 1104–21 (15th ed. 1982); *see* H.R.Rep.No.95–595, 95th Cong., 1st Sess. 220 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. In this court's opinion, the evidence did not rise to the level of gross mismanagement. Overdrawn checks are not atypical for a debtor experiencing financial difficulties. Here, the overdrafts never exceeded $2,000, the overdrawn checks were made good, and the number of overdrafts after the filing was substantially reduced, if not totally eliminated. The debtor's "messy" books can be traced to the poor condition in which the previous owners left them. Evidence indicated that the debtor's bookkeeping had improved compared to the previous owners'. Evidence of declining sales and of losses during the period prior to the filing surely is prevalent in Chapter 11 cases—few profitable corporations file petitions in bankruptcy. Evidence indicated that current management has reduced certain costs and increased the gross profit margin. Thus, while further effort needs to be made, the court is not persuaded that current management is incompetent or has grossly mismanaged the debtor's affairs.

■ The $1,800 loan transaction involving Baker, Donald Davis and the debtor might have been more accurately reflected on the debtor's records, perhaps as a loan from Donald Davis to the debtor. The money received by Davis from the video game proceeds was properly reflected as income to the debtor, however, and it was used to reimburse Davis for expenditures he made for the debtor's benefit. The court is not persuaded that current management is dishonest or has committed fraud.[6]

For example, Richard Davis notes that the debtor's application to the court for compensation did not reveal that he and his wife received free food and some gasoline from the debtor, though it is clear that Richard Davis was aware of that. The court finds that omission to be at most an oversight, and finds no violation of Local Rule 2007(b)(1).

---

**5.** Assuming, without deciding, that Richard Davis is the sole stockholder of the debtor, the filing in bankruptcy was still fair and equitable as to him *as stockholder,* even though as secured creditor (assuming also that he has that status) he might be unhappy with that action.

**6.** Nor is the court impressed with the other evidence allegedly proving fraud or dishonesty.

■ The court is concerned with the debtor's violation of Local Rule 2007(b)(2). For some period of time the debtor failed to maintain the required levels of insurance coverage. Furthermore, there is evidence that the debtor has not timely filed all required reports with the United States Trustee. Such violations are serious, and, if continued, may well warrant the appointment of a trustee. *See In re Caroline Desert Disco, Inc.*, 5 B.R. 536, 537, 6 B.C.D. 698, 699, 2 C.B.C.2d 1133, 1135 (Bkrtcy.C.D.Cal. 1980). Here, however, the proper amount of insurance is currently being maintained. The court expects that the debtor will file required reports in a timely fashion with the United States Trustee. Because the Bankruptcy Code adopts a "flexible standard for appointment of trustees," *see In re Parr*, 1 B.R. 453, 457, 5 B.C.D. 1143, 1146, 1 C.B.C.2d 199, 205 (Bkrtcy.E.D.N.Y.1979), the court is not prepared to adopt a *per se* rule that any violation of the local rules constitutes gross mismanagement. *But cf. In re Sea Queen Kontaratos Lines, Ltd.*, 10 B.R. at 610, 7 B.C.D. at 602, 4 C.B.C.2d at 493 ("Absent a local rule violation, there is no showing of gross mismanagement *per se*.")

■ Finally, the court believes that appointment of a trustee would not be in the best interests of all creditors. Appointment of a trustee would impose a substantial financial burden on an already hard pressed debtor, and could preclude an effective reorganization due to resulting administrative expenses. *See In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 644, 6 B.C.D. 495, 500, 2 C.B.C.2d 348, 361 (Bkrtcy.E.D.N.Y.1980). There is evidence indicating that if the debtor is able to submit a feasible plan, then the largest secured creditors would be willing to work with current management in its effort to reorganize. In addition, as discussed below, any party in interest now has the opportunity to propose a plan of reorganization. In these circumstances, on the evidence before it, the court is not persuaded that no feasible plan is possible.

The motions to appoint a trustee are denied.

### III. Reduction of Time

■ Title 11 U.S.C. §§ 1121(c) and (d) provide:

(c) Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if—

(1) a trustee has been appointed under this chapter;

(2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

(3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class the claims or interests of which are impaired under the plan.

(d) On request of a party in interest and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

*See* Local Rule 3005(a), (c). These provisions were intended to provide the court with flexibility in individual cases, *see In re Lake in the Woods*, 10 B.R. 338, 344–45, 7 B.C.D. 588, 591, 4 C.B.C.2d 828, 834 (D.C.E. D.Mich.1981), and to democratize the reorganization process. *In re Kun*, 15 B.R. 852, 853, 8 B.C.D. 638, 639 (Bkrtcy.D.Ariz.1981). The Bankruptcy Code "recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company." H.R.Rep.No.595, 95th Cong., 1st Sess., 231–32 (1977) *reprinted in* 2 App. *Collier on Bankruptcy* 231–32 (15th ed. 1982).

■ This debtor operates a seasonal business. The debtor filed its petition on March 15, 1982. Thus, the 180 day period would not expire until after Labor Day, the traditional final week-end of the summer season. Furthermore, it appears that the major obstacle in the path to a successful reorganization in this case is the principal parties' acrimonious relations. They continue their bitter feuding not only at their own expense, but at the expense of all creditors of the debtor. Shortening the

debtor's exclusive period for filing a plan will permit any party in interest, including parties with perhaps a more objective view of the debtor's circumstances, to file a plan. The court believes that the interests of all creditors and the interests of the debtor as well will be best served by permitting any party in interest to file a plan. Therefore, pursuant to 11 U.S.C. § 1121(d), the court shortens both the 120-day and 180-day periods referred to in section 1121 so that both expire as of July 12, 1982. After July 12, 1982, any party in interest may file a plan or parties may file competing plans of arrangement for the consideration of the creditors. The court urges the parties to put aside their personal differences and unite in a common effort to successfully reorganize the debtor for the benefit of all creditors.

Dated: July 12, 1982, at Bangor, Maine.[7]

---

**7.** An Order of Court in this case was entered on July 8, 1982. This Memorandum of Decision constitutes the Findings of Fact and conclusions of law required by Bankruptcy Rule 752.